UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| TERRY WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-4030 |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal [# 12] is DENIED, and the Commissioner's Motion to Affirm [#14] is GRANTED.

**BACKGROUND**

Plaintiff, Terry Williams ("Williams"), was 44 years' old at the time of his administrative hearing. (R20) He has an eleventh grade education and lives with his parents. (R499, R507) In the past, Williams has been employed as a landscaper, industrial laborer, hand packager, and machine packager. (R20, 79)

On October 16, 2001, Williams applied for disability insurance benefits ("DIB"), alleging disability due to back pain, arthritis, headaches, and memory loss that began on March 1, 2000. (R54, R481) His application was denied both initially and on

reconsideration. (R36, R40) Williams requested a hearing before an administrative law judge ("ALJ"). A hearing was held before ALJ Andrew Palestini on May 30, 2003, at which Williams, who was represented by counsel, and vocational expert ("VE") Roger Marquardt appeared and gave testimony. (R490-523)

Williams testified that prior to the alleged onset of disability, he performed mainly heavy labor jobs, such as landscaping and industrial labor that involved lifting 50 to 100 pounds at times. (R492) He has worked previously as a meat packer, machine packager, truck driver, forklift operator, and steel cutter. (R493-98)

Williams has pain in two areas in his back from herniated discs. (R500) He has pain on the left side of his back that goes down his left leg and also has a burning sensation in the top of his back. Id. He has numbness in the left side of his left foot, which sometimes causes him to fall when walking. (R505) Williams further testifed to pain in his left knee that causes him to limp badly during the winter. (R512) Despite taking Seroquel to help him sleep, he still never gets five hours of sleep at night because of the pain. (R500-01) As a result, Williams needs to lay down and nap during the day, sometimes for the whole day. (R501) In fact, in a normal month, pain makes it difficult for him to get out of bed at least ten to 20 days. (R507) He also drinks to help his pain. (R501-02)

Williams testified that he can only sit or stand for five to ten minutes at a time before needing to change position. (R504) He might be able to lift five pounds, but wouldn't want to push it, and couldn't lift anything on a repetitive basis. (R503-04) Williams walks slowly and has difficulty with stairs, but might be able to walk a block before he would need to sit and rest. (R506) He is afraid to bend over totally because of the pain and also experiences spurts of headaches since suffering a head injury when he was younger. (R510-11)

He spends his time watching TV and reading a little bit. (R507) Williams is a member of a fishing club; although he used to go fishing a lot, he has only been able to go once in awhile for the last two years. (R508) In fact, he went fishing for a couple of hours two weeks prior to his administrative hearing. Id. Friends stop by the house to visit once or twice a month. (R509) He cooks and prepares meals by himself a little bit. (R512) Williams does not drive because he lost his driver's license after getting a DUI

Williams has been diagnosed with depression secondary to alcohol consumption and a general medical condition. Id. He testified that knowing that he can't work any more and will have to live off of Social Security brings him down. Id. However, his appetite is usually pretty good, and he weighs more now than he ever has before in his life. (R509-10) He has been seeing Dr. Houssein for about a year, but the only treatment that he is receiving is the prescription of pain medication and Lexapro for his depression. (R511)

In April 2003, he went to the hospital for back pain and received some Vicodin and Darvon. (R515) The doctor there noted his elevated blood pressure and told him to follow up with his doctor. Id. Williams called his doctor and left a message but did not hear back from his doctor. Id. However, he states that Dr. Hussein has him on medication for high blood pressure. Id.

The ALJ presented the VE with the following hypothetical:

> [C]onsider the effect it would have on the claimant's ability to perform work activity if he was limited to 20 pounds occasional lifting, ten pounds frequently lifting. Could sit or stand up to six hours a day with normal routine changes. Should do no climbing, but could occasionally bend, squat, crawl or kneel. Work should be simple, routine and repetitive with no more than superficial interaction with others. With those limitations, would he be able to return to any of his past relevant work?

(R518) VE Marquardt testified that this hypothetical individual could not perform any of his past relevant work. Id. When given the additional criteria of a claimant that is a younger individual with an 11th grade education, the VE responded that the individual could perform unskilled, light work as an electronics or small products assembler, parking officer, or newspaper carrier. (R519) On the state level, there are 1,000 of the assembler jobs, 300 of the parking officer jobs, and 850 newspaper carrier positions. Id. On the national level, there are 100,000 of the assembler jobs, 50,000 of the parking officer jobs, and over 100,000 of the newspaper carrier jobs. Id.

If the hypothetical was amended so that standing was limited to five to ten minutes at a time, with an ability to live no more than five pounds, and no pushing or pulling, then the VE indicated that the hypothetical individual could not perform the unskilled, light jobs that had been identified. (R520) Moreover, while the individual could probably perform some sedentary jobs, the restriction to only superficial contact with others would eliminate the existence of any competitive employment in significant numbers. Id.

The ALJ then amended the first hypothetical to limit sitting to five to 15 minutes at a time, standing of up to 15 minutes, lifting of ten pounds, with rarely squatting, bending, crawling and climbing, and asked if these restrictions would have ruled out the unskilled, light work. Id. The VE responded that unskilled, light work, as well as unskilled, sedentary work would be ruled out. (R520-21)

Williams' attorney questioned the VE and asked if a claimant's need to be absent from work for three days per month as a result of impairments or treatment would allow any of the past relevant work. (R522) The VE indicated that the individual would not be able to perform such work on a full-time basis given the consistent absences. Id. The attorney

then asked if the need to take unscheduled breaks every 30 minutes during an eight-hour workday to rest for ten minutes before returning to work would be consistent with competitive employment, to which the VE responded that it was not. Id.

On November 19, 2003, the ALJ issued his decision. (R27) The ALJ found that Williams' drug and alcohol addiction, mild degenerative disc disease, depression, and high blood pressure were "severe" impairments based on the requirements in the Regulations. (R26) The ALJ determined, however, that Williams does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. Id. He recognized a mild restriction of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, one or two episodes of decompensation of extended duration. Id. When his limitations are considered separately from his drug and alcohol abuse, he has slight limitations in the activities of daily living, slight limitations in social functioning, moderate limitations on concentration, persistence, and pace, and no episodes of extended decompensation. Id.

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found the degree of Williams' alleged limitations to be not fully credible or substantiated by the record. Id. The ALJ determined that Williams had the following residual functional capacity:

> Williams could life 20 pounds occasionally or 10 pounds frequently. He could sit or stand for six hours a day, with normal, routine changes. Mr. Williams can do no climbing. He can occasionally bend, squat, crawl or kneel. He is capable of simple, routine repetitive work with no more than superficial interactions with others.

<u>Id.</u>  After determining that Williams would not be able to perform his past relevant work, the ALJ decided the case at step five after finding that he retained the residual functional capacity to perform a significant range of unskilled work, for which there were 2,150 such jobs in the regional economy and 250,000 such jobs in the national economy. (R26-27) Based on a demonstrated exertional capacity for a significant range of unskilled work, William's age, education, work experience, and residual functional capacity, the ALJ concluded that Williams was not under a disability as defined in the Social Security Act (the "Act"). (R27)

Williams submitted a Request for Review of Hearing Decision. (R15) On August 27, 2004, the Appeals Council declined review of his claim, and the ALJ's decision became the final decision of the Commissioner. (R8-11) This appeal followed. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment

renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are

supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In his appeal, Williams comments that he is not satisfied with his former attorney's performance and believes that his case has been handled poorly from the beginning. Although his argument is far from clear, when construed liberally Williams' pleadings raise essentially one claim: that the ALJ's decision finding him able to perform a significant number of jobs in the national economy was not supported by substantial evidence. The Court disagrees and finds that the ALJ's finding that Williams has the residual functional capacity to perform the physical exertion and nonexertional requirements of a significant range of unskilled work with certain limitations is supported by substantial evidence.

Williams received treatment at Trinity Medical Center on June 2, 2001. At that time, the doctor's notes indicate that he has been under a physician's care for drug and alcohol abuse, as well as indiscriminate expression of hostility. He was encouraged to cooperate with the treatment plan and comply by taking the medications prescribed to him; it was also suggested that he consider participating in an inpatient treatment program for his alcohol dependency.

On October 15, 2001, Williams went to the hospital complaining of increased pain in his lower left back and hip area and seeking pain medication. An x-ray of his lumbar spine showed disc space narrowing at L4 over L5, early degenerative changes, and

minimal retrolisthesis at L4 over L5.  He was prescribed Naprosyn and Darvocet, advised to alternate heat and cold four times per day, and directed to follow-up with a physician for further evaluation.  On October 19, 2001, an MRI indicated a large disc herniation at L5-S1 on the left side encroaching the lateral recess and a small disc herniation on the right side at L4-L5.  On October 26, 2001, he again went to the emergency room complaining of back pain and was prescribed Darvocet and Norflex.

On November 3, 2001, Williams went to the emergency room complaining of pain in his back and was given Darvocet.  On November 15, 2001, he went to Genesis Medical Center, where he received prescriptions for Motrin, Darvocet, and a Medrol Dosepak.  On November 20, 2001, he again presented at Genesis Medical Center.  The treatment notes indicate that Williams provided a "very vague and contradictory history of the course of his illness initially stating that this symptoms are new today, later admitting that they are not new. . . ."  He then indicated that his symptoms had begun a couple of weeks earlier but then changed his story when told that the MRI predated that time.  Williams then stated that his symptoms had begun the day of the MRI but changed his story again when told that that did not make any sense.  The doctor noted that during his November 15, 2001, visit, Williams was given enough medication to last for several weeks but was already out of medication; the records reflect that Williams stated that he had taken seven Darvocet and four Soma tablets already that day.  The doctor prescribed Tramadol for his pain and recommended that Williams should have his primary care physician prescribing his medications.

On November 21, 2001, Williams received a consultative examination by Dr. Kenneth Follett, a neurosurgeon at the University of Iowa.  Dr. Follett found him to be in no

acute distress, with a normal stance and markedly antalgic gait. Williams demonstrated full strength in his extremities and showed no signs of atrophy or fasciculations. Dr. Follett found his most significant symptom to be chronic low back pain of clearly myofascial origin and concluded that operative intervention was not indicated given the mild nature of his radicular symptoms. He recommended that Williams could benefit from pain management through a pain clinic with specific attention directed toward treatment of the myofascial pain syndrome, epidural steroid injections to relieve radicular symptoms, and some cognitive-behavioral interventions to assist with his history of anxiety and depression.

Two days later, on November 23, 2001, Williams again presented to the emergency room. The physician's notes indicate that Williams was able to stand on his toes, walk, and perform a partial knee bend without assistance. He was given a prescription for Panlor, counseled about "drug-seeking behavior," and advised to seek his medications through his primary care physician.

On December 7, 2001, Williams was seen at the Pain Management Center at Genesis. Dr. Stephen Heaney found him to be in no acute distress and exaggerating his symptoms. When distracted, Williams demonstrated less response to pain. Dr. Heaney concluded that Williams was magnifying his symptoms, but gave him an epidural injection and prescriptions for Darvocet and Soma to get him through while he obtained a new primary care physician. Despite the fact that Dr. Heaney indicated that he would authorize no refills on these prescriptions, Williams called back on December 13, 2001, and unsuccessfully attempted to obtain refills on the prescriptions.

On December 16, 2001, Williams was admitted to the hospital with suicidal threats associated with his back pain. An EMG showed no abnormalities, and an examination by

a neurologist did not indicate that operative intervention was warranted due to an absence of neurologic findings. He exhibited a fair amount of cooperation, continued to demonstrate pain behavior of a mild to moderate degree, and conveyed the impression of an untreated bipolar disorder. The treating physician diagnosed him as having an adjustment disorder, depressed mood, bipolar disorder in partial remission, herniated disk L5-S1, GERD, and alcohol dependence. Williams refused a referral for treatment for alcohol dependence issues, obtained a small prescription of Vicodin, and was advised to seek treatment in the pain clinic program.

In December 2001, Williams' treating physician, Dr. Rameshkumar Raman, referred him for treatment in the pain clinic and prescribed Darvocet "only for severe pain, otherwise he is to follow-up." Dr. Raman's notes indicate that the Darvocet seems to help Williams' pain and that he recommended that Williams finish the course of epidural injections.

On January 12, 2002, Williams saw Dr. Michael Stempniak for a consultative mental status examination. Dr. Stempniak noted that Williams was fully oriented as to person, place, and situation, as well as that the usual activities of daily living, such as dressing, eating, and hygiene are not a problem for him. It also appeared that Williams was capable of managing his own financial affairs.

Williams was also seen by Dr. Stanley Rabinowitz for a physical examination. Williams' speech was clear and understandable. He demonstrated no hearing impairment, and walked normally without the aid of an assistive device. Dr. Rabinowitz noted a normal range of motion with the exception of his left shoulder and straight leg raising positive at 80 degrees bilaterally. There was no cyanosis or clubbing; grip strength in both hands was normal with no impairment to digital dexterity. Sensory examination was within normal

limits with the exception of decreased light touch sensation along the lateral aspect of the left lower extremity. Reflexes were normal, and motor strength was intact. Williams had no difficulty getting on or off the examining table and could squat halfway down. Dr. Rabinowitz's impression was that Williams had chronic LS pain syndrome secondary to lumbar disc herniation, L5-S1, left with persistent pain and a history of major depression.

Dr. Raman's treatment notes from January 31, 2002, indicate that Williams had run out of Darvocet because he had to give 15 pills to a friend from whom he had borrowed pills earlier. He sought treatment after experiencing pain when trying to move snow with a snow blower. Williams was advised that it was too soon to refill his prescription. He was given samples of Relafen and advised to stop smoking.

On February 13, 2002, Dr. Tyrone Hollerauer concluded that Williams has a substance abuse problem but appeared to be cognitively intact with an intact memory. Difficulty concentrating was found to be secondary to his physical and substance abuse issues. Williams was able to understand instructions and find his way around. Dr. Hollerauer's conclusion was that Williams was psychologically able to perform substantially gainful activity but is limited to unskilled work due to periodic substance abuse and distraction secondary to perceived pain. This diagnosis was affirmed by Dr. Jerrold Heinrich on May 2, 2002.

On February 19, 2002, Dr. Frank Jimenez noted that Williams had a normal gait without the use of an assistive device and a normal range of motion in all joints and the spine. Dr. Jimenez found that Williams could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk or sit with normal breaks for a total of six hours in an eight-hour workday, and push or pull without limitation. Although he could never climb

with a ladder/rope/scaffold, he could climb with a ramp/stairs, stoop, kneel, crouch, and crawl occasionally and could balance frequently. There were no established manipulative, visual, communicative, or environmental limitations. Accordingly, Dr. Jiminez concluded that Williams was capable of performing light work with occasional climbinb of ramps and stairs, stooping, kneeling, crouching, and crawling. This opinion was affirmed by Dr. Frank Norbury on May 2, 2002.

Williams went to the emergency room on April 10, 2002, complaining of back pain and seeking both intramuscular injections and pain medication. He was again counseled about the appropriateness of seeking opiate pain medications through the emergency department rather than through his treating physician or the pain clinic.

On April 14, 2002, Williams presented to the emergency room for detoxification after having consumed over 20 beers the night before despite his protestations that he had not been drinking "recently." He was diagnosed with alcoholism and withdrawal syndrome and treated. In June 2002, Williams reported that he was abusing alcohol and drinking "enough to get loaded," as well as "borrowing" Darvocet from his father.

Williams also received treatment from Dr. Iqbal Hussain. On September 24, 2002, Dr. Hussain noted that Williams was a healthy-appearing, overweight white male. At that time, he was not in any distress but was prescribed Darvocet for his back pain.

On September 29, 2002, Williams was admitted to the emergency room at Trinity Medical Center after expressing suicidal thoughts. The doctor noted a strong odor of alcohol on his breath, and his blood alcohol level was 245 mg/dL on admission, which is indicative of severe alcohol poisoning. Williams admitted to binging on alcohol over the last few weeks, stating at one point that he drank six to 12 beers each weekend night and that

he had consumed about 18 beers just prior to admission. The physician noted his history of drug seeking behavior through multiple providers, with an inappropriate use of anxiolytics and narcotics from various sources including doctor shopping and taking controlled substance from others not prescribed to him. Williams was instructed to continue taking his medications as prescribed, discontinue alcohol abuse, receive further alcohol rehabilitation counseling, and follow up with his medical providers for appropriate management of his chronic back pain.

On October 8, 2002, Williams saw Dr. Hussain for back pain. He described his pain as "low-intensity lower back pain" and denied any weakness in his legs. He was not in any distress, and an examination of his back was unremarkable. Approximately two months later, Dr. Hussain noted that Williams' back pain had become more frequent but had not changed in intensity. Dr. Hussain continued to provide Darvocet and also added Naproxen.

On January 10, 2003, Williams was seen for his back pain. All extremities were moved with equal strength and he was able to toe walk and heel walk without much difficulty. Williams admitted to using up to 12 Darvocet each day.

On January 23, 2003, Dr. Hussain completed a functional capacity questionnaire. In his evaluation, Dr. Hussain indicated that Williams was capable of tolerating low stress jobs. He further opined that Williams could sit or stand for 15 minutes at a time before needing to change positions and could sit or stand for less than two hours in an 8-hour work day. He needs to walk every 20 minutes for approximately 10 minutes at a time, requires a job that allows him to shift positions at will, and needs to take a 10 minute break every 30 minutes. Williams does not require any kind to assistive device to walk and can lift/carry up to 10 pounds occasionally. Although he can rarely twist, stoop, crouch, climb

ladders, or climb stairs, Williams has no psychological or environmental limitations that would affect his ability to work at a regular job on a sustained basis.

Williams went to the emergency room again on April 26, 2003. He indicated that he was taking four Darvocet at a time and getting no relief. The examination revealed no tenderness in his back and pain on straight-leg raising to 20-30 degrees on both sides. Williams was advised not to take too much of his pain medication and to take it as directed because taking four Darvocet (which contains Tylenol) at a time would result in an overdose of Tylenol that could damage his liver.

Based on the record, the ALJ found that Williams retained the capacity to perform work that required lifting/carrying up to 20 pounds occasionally and 10 pounds frequently, sitting and standing for up to six hours in an 8-hour day with normal routine changes, and occasionally bending, squatting, crawling, and kneeling. The ALJ also concluded that he could perform simple, repetitive, routine work that involved no more than superficial interaction with others, which corresponds to a limited range of light work.

In making these findings, the ALJ discounted the opinion of Dr. Hussain, Williams' treating physician. The Seventh Circuit has recognized that a treating physician's opinion is not binding on the Commissioner. Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982). On this issue, the Seventh Circuit has found that:

> The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise.

Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985). However, there is no presumption of bias against a treating physician's disability opinion. Edwards v. Sullivan, 985 F.2d 334,

337 (7th Cir. 1993). Rather, the ALJ, as the trier of fact, must consider the treating physician's possible bias. Id. The Commissioner will not give controlling weight to the treating physician's opinion on the nature and severity of the claimant's impairments unless the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques. . . ." 20 C.F.R. § 416.927(d)(2).

> In short . . . it is up to the ALJ to decide which doctor to believe -- the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases -- subject only to the requirement that the ALJ's decision be supported by substantial evidence.

Micus v. Bowen, 979 F.2d 602, 609 (7th Cir. 1992).

It is the province of the ALJ to resolve evidentiary conflicts. Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 542 (7th Cir. 1992); Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). The existence of an evidentiary dispute is not grounds for reversing the ALJ's decision to credit one version of facts over another. Herr v. Sullivan, 912 F.2d 178, 181 n.4 (7th Cir. 1990) However, the ALJ must explain with particularity the basis of his decision. Young v. Secretary of Health and Human Services, 957 F.2d 386, 393 (7th Cir. 1992).

Dr. Hussain's RFC assessment was discounted after the ALJ properly noted that it was devoid of any objective evidence in support of the claimed limitations and conclusory assertions of disability. See Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995) (finding it

entirely permissible to discount the opinion of a treating physician where the opinion is unsupported, internally inconsistent, or inconsistent with other evidence.)  In fact, Dr. Hussain routinely noted that Williams appeared to be healthy and in no acute distress.  In October 2002, his examination was "unremarkable." In December 2002, Dr. Hussain found no tenderness in his back and grossly intact neurological results.  In January 2003, Williams was able to move all extremities equally and with strength; he was also able to heel-toe walk without much difficulty.  Thus, the ALJ considered but reasonably discounted the conclusions of Dr. Hussain, as they were either unsupported by or contradictory to other objective medical evidence in the record.  His rationales for doing so were sufficiently articulated in his written decision, and his conclusions are supported by substantial evidence.

The ALJ also discounted Williams' subjective complaints of pain and alleged limitations.  The record indicates that in considering Williams' RFC, the ALJ gave full consideration to the medical evidence of record, fully considered his subjective complaints of pain, and credited them to a large extent as far as they were consistent with objective evidence in the record.  It is well-settled that "[a]n ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole." Knight, 55 F.3d at 314. Factors to be considered include: a claimant's activities of daily living; location, duration, intensity, and frequency of pain; dosage and effectiveness of medication; and other measures taken to relieve the pain.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii).  Again, such credibility determinations may not be overturned by this Court unless they are patently wrong.  Herr, 912 F.2d at 182; Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

In reaching the conclusion that Williams' testimony was not fully credible regarding his ability to perform a range of light work, the ALJ relied on the following facts: no physician of record has made examination findings indicating that he is limited to the degree claimed, and more than one physician determined that he was capable of performing light work; the record contains no documented RFC assessment limiting him to the degree asserted; and treating notes reveal a history of seeking pain medication, taking inappropriate doses of the pain medication, and abusing alcohol. The record also indicates that he engages in some average daily activities, takes care of some of his own personal needs, and significant factors such as problems concentrating (when unimpaired by excess alcohol consumption) or weight loss appear to be absent. After a review of the entire record, this Court finds that the ALJ's credibility determination was not patently wrong but was, in fact, reasonable.

The ALJ's decision was also supported by the testimony of the VE, who identified a significant number of unskilled, light jobs in the economy that would accommodate a younger individual with an 11th grade education who is limited to 20 pounds occasional lifting, ten pounds frequently lifting, could sit or stand up to six hours a day with normal routine changes, should do no climbing, but could occasionally bend, squat, crawl or kneel, with work that was simple, routine and repetitive with no more than superficial interaction with others. Given these restrictions that the ALJ found to be supported by the objective evidence in the record, the VE identified more than 2,150 jobs locally and 250,000 jobs nationally. See Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (holding that positions in excess of 1,400 exist in significant numbers).

Williams has the burden of demonstrating that he is disabled and providing medical evidence in support of his claim. Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004). Here, he clearly had all of the process to which he was due and had a full and fair opportunity to present his claims. Nevertheless, the record contains no objective medical evidence that is inconsistent with the ALJ's findings. This is not a case where medical records were insufficient or incomplete, which could necessitate further development of the record. Rather, the medical records simply failed to compel the conclusion that Williams is disabled within the meaning of the Act. Accordingly, the Court must conclude that the ALJ's determination was supported by substantial evidence.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#12] is DENIED, and the Commissioner's Motion to Affirm [#14] is GRANTED. This matter is now TERMINATED.

ENTERED this 21st day of June, 2006.

    Michael M. Mihm
    Michael M. Mihm
    United States District Judge